We'll hear argument first this morning in Case 12-1168, McCullen v. Coakley. Mr. Rienzi. Mr. Chief Justice, and may it please the Court. This Court has held that the public sidewalks are a natural and proper place for free citizens to exchange information and ideas. And for that reason, the Court has held that public sidewalks occupy a special position in First Amendment analysis. Yet the Massachusetts law at issue here makes it a crime to enter onto certain public sidewalks even for the purpose of peaceful conversation or leafleting. The law applies at abortion clinics throughout the State on every hour of every day that they are open, regardless of the circumstances. Massachusetts asks this Court to uphold that statute under the time, place, and manner test. But the law fails each aspect of that test. I would like to begin with narrow tailoring. The State says the law is necessary to protect its interests in preventing obstruction and congestion. But the law is not narrowly tailored to those interests for three reasons. First, the law applies regardless of whether there is any threat of obstruction or congestion at all, even when the sidewalks are entirely open and empty. For example, Mrs. McCullen generally does her counseling early in the morning on Tuesdays and Wednesdays, beginning at 7 o'clock in the morning. She testified that she is sometimes alone when she does this counseling. Nancy Clark testified that 90 percent of the time that she is at the clinic in Worcester, she is all alone. A statute that makes it illegal for Mrs. McCullen or Mrs. Clark to engage in peaceful, consensual conversation on a public sidewalk for fear of obstruction and congestion is not narrowly tailored. Ginsburg. Mr. Rienzi, the problem that the State faced is it doesn't know, and it has a history, it has a considerable history of disturbances, of blocking the entrance. And it doesn't know in advance who are the well-behaved people and who are the people who won't behave well. So and after the disturbance occurs, it's too late. So the State is trying to say, we want to make sure that the entrance is not blocked. And the only way we can do that is to have a rule that applies to everyone. We can't screen people to know who will be well-behaved and who will be disruptive. So I think the State is simply wrong about that fact for several reasons. There are many tools that the State either has in its current toolbox or could enact that would deal with that concern. And if I may back up for a second, I think there are really two different interests that the State asserts when it makes that argument, Justice Ginsburg. First, they say that there are actual deliberate bad actors, right? There are some people whom the State claims have deliberately violated the law and blocked the door and interfered with access. And then secondly, the State says there's also some circumstances where there are enough people on the sidewalk that even lawful, consensual conversation might accidentally block a door. I think those are actually two quite different interests, but there are tools in the toolbox to deal with both of them. For example, Section E of this statute makes it illegal to impede, block, obstruct or even hinder somebody's access to the clinics. And that section of the statute is not challenged here and never has been. Scalia, do you know — I should probably ask this of the other side, and I will, but do you happen to know when was the last time that Massachusetts prosecuted somebody for obstructing entrance to an abortion clinic? So I believe the last site in the record that I'm aware of is, as of 1997, there was a decision in a previous injunction case against people who had been adjudicated to have broken rules. There's a 1997 case on that. To my knowledge, they've never brought a case, for example, under the Federal FACE law, which has been in existence for 20 years. So there have been laws against obstruction during this entire period, right? There have been laws against obstruction the entire time. And you say that only once in 1997, that was the last time a prosecution was brought. And that was an injunction against prior bad actors. That was not a FACE prosecution or a Section E prosecution. Sotomayor, you're not taking the position that 1997 was the last time an entrance was obstructed, or that the police were called to open access to a clinic? Are you taking that position, that the last time it happened, it was 1997? I frankly don't. I couldn't say that I know the last time it happened. But you do know that in the record there were more examples. I know that in the record there was testimony claiming that that happened. My argument is simply that the State has tools that are deliberately designed to deal with that. And so the United States ---- Kagan, Mr. Rienzi, the State says of that particular tool that it's a hard thing to prosecute, because you have to show intent. And there's a lot of obstruction and interference that goes on naturally just because there are a lot of people around, so that that is an insufficient tool, is what the State argues. Yes. And so to the extent what the State is saying – to the extent the State is claiming there are deliberate bad actors deliberately blocking the door, I don't think that's a very persuasive argument. There are police on the scene, and if the police say, get out of the doorway, either the person moves, in which case there's not a problem anymore, or they don't, in which case intent is pretty clear. Amicus United States has prosecuted, I think, more than 45 cases and gotten more than 70 convictions under that statute. And sometimes there are those bad actors, but probably more often it's just a function of there are just lots of people, and they, your clients, and all of them want to be as close as possible to the site, and that that naturally leads to an interference with normal access. And so I agree that's the second part of the State's argument. I don't think this law is narrowly tailored to that concern in two respects. One, the law applies – you know, the evidence in the case is that the crowds that the State is concerned about happen essentially at one clinic, one day, one time. Saturday morning is in Boston, and when they happen, there are video cameras rolling and police officers present. And there's no reason to believe the police can't simply say, move out of the doorway. And if someone's in front of the doorway, they certainly should do that. Alitoso, does the record show how many clinics in the State are covered by the law? I believe there are 11 or 12 clinics in the State, and so long as they are freestanding abortion clinics, they fall within statutory definition. How far do you want to go in your concession? Would you want to concede this point, that imagine the State has two groups of people, and one group feels what the other is doing is terribly wrong, and the second group feels we absolutely want to do it, and everyone is in a fragile state of mind. And they want to, if possible, at least one group wants to sort of shout as loud as you could at the other, please don't do this. And the other says, please leave me alone. And we're not saying which group is rich. The analogy is obvious. But if I keep all the titles out, does the State have the right, in your opinion, to say it's tough to referee this, we see the potential for real harm on one side of the other, so we're going to have this kind of 35-foot boundary? You want to concede that and say, okay, but the evidence here doesn't justify it, or do you want to fight that, too? So, no, I do not mean to concede that. I don't think — I think a solution that is done with painted lines on the sidewalk that says at a point in time, please don't do this. You know, now you're into the details. I want to know about the principle. I mean, I can imagine the principle applying special care need be need must be taken outside of hospitals for veterans, even though there's some who are very much opposed to the war, because these people are going to be coming out, they'll be in wheelchairs, it'll be terrible. And others thinking, you know, we can think of many, many situations, irrespective of subject matter, where there is a need for such refereeing, and I just want to know if the concept is okay with you or if not. You're into the details. Generally speaking, no. I don't think the concept that you're saying is okay. Sotomayor, so protesters like the one we had in the Schneider case at a funeral of a veteran can go right up to the public sidewalk outside the church and put up the signs that they did and give out the leaflets that they did, talking about that veteran in the ways that they did? That's okay by you? So a couple of points about that. One, I think there was no evidence there that they were disruptive. They were just expressing their First Amendment rights. But there was the potential for disruption because of the strong sentiments around that. Agreed. I think a statute that worked the way this one does here, that would make it illegal to even engage in peaceful conversation on sidewalks near a church or near a funeral or near just about anything else, I think clearly is not permitted by the First Amendment. In Schneider, they were held not so far back that their shouts and protests couldn't be heard. Isn't that the case? It could still be heard. I think it's made perhaps for part of the funeral procession. Perhaps for part of the funeral procession that that passed by. You see now why I'm trying to narrow it, because in my case in Schneider, I thought it was pretty important that the demonstrators were behind a hill somewhere and the police restricted where they can go. Many States have enacted similar laws, and I thought that's important because maybe it would have come out differently. I mean, you could argue that and I could. So I'm trying to narrow it. I'm trying to see to what extent do I have to look at this particular set of facts, in which case we're into the hearings, et cetera, and to what extent is there a matter of very broad principle here, and any help you can give me on that would be appreciated. So the matter of very broad principle is that a law that makes it illegal to even engage in consensual conversation, quiet conversation, on a public sidewalk, an act that makes that a criminal act for which Mrs. McClellan can go to prison, I think is not permissible under the First Amendment. If you compare it to, for example, the Federal military funeral protest law, that law is specifically drawn to acts that disrupt the peace and good order of the funeral. And I think that is different. Kagan, But are you saying that you could not do an act that instead just says, look, it's a little bit too hard to figure out what and what does not disrupt peace and order? So we're just going to say 25 feet around a funeral or 25 feet around any facility. That that's never permissible? So generally speaking, I think any law like that runs into a big First Amendment problem of even eliminating peaceful, consensual conversation that doesn't disrupt anything. And this Court's past First Amendment decisions have said that precision of regulation is required. One difference, if it's a rule around any facility or a rule around all funerals, for example, is that there isn't nearly as much distortion of the marketplace of ideas as happens when you do what Massachusetts did here, which is pick. For example, I was intrigued by one of the examples that you gave in your own brief, which you said slaughterhouses. So let's say that there are animal rights activists, and this is easy to imagine, who try to interfere with access in and out of slaughterhouses. And a State passes a regulation that says there's a ton of interference, it's preventing the operation of these facilities, employees can't get in, suppliers can't get in, slaughterhouses are leaving the State because of this problem. And so we're just going to set up a zone, and let's call it 30 feet, because it's very hard to enforce anything else. I guess my reaction to that hypothetical, you must have used it for me to say, oh, that's terrible. But my reaction, my intuition was kind of what's wrong with that? Just have everybody take a step back. So what is wrong with that? So what's wrong with that is a couple of things. One, again, this Court's decisions require precision of regulation. So an injunction, for example, against groups and individuals, like Madsen and Schenck, for example, an injunction against groups and individuals who have interfered with access, keeping them back, I think that's perfectly permissible. We take no issue with that type of solution. It's the generally applicable statute, right, that's tied to just one particular, often protested event, that gives the State enormous power to interfere with the marketplace of ideas. Alito, I think one of the examples that is given in one of the amicus briefs in this case, and they provide a lot of background, is a State law that creates a buffer zone around every fraternal lodge. What would you say about that? I think it is difficult to imagine the government interest to — well, first, I guess I don't know the particulars of that law and what it — what it restricts. If it restricts peaceful conversation on public sidewalks any place there's a fraternal lodge, I would say that that should not be permissible under the First Amendment. I think, generally speaking, the idea of the government picking one particular item and saying, well, around this, suddenly the character of the public forum changes from a place where people can have peaceful, consensual conversations to a place where we will imprison them for doing that, I think that's a dramatic restriction of First Amendment rights. I think if there is a particular group or individual who keeps interfering with the fraternal order, of course you can get an injunction against that type of behavior. But I don't think the State can say even peaceful discussion and leafleting on the — But let's go back to the Slaughterhouse case. I mean, there might be people who say it's really important to us to actually be able to face-to-face talk with the employees and tell them why they should get different jobs or why they should change their practices in various kinds of ways. And, you know, there are some people who think signs and chants are great, but there are people who really want to make one-to-one contact with the truck drivers, with the employees, whoever. But you say, you know, we have to let whatever interference goes on, even if there's a record of real obstruction, of real interference with the operation of the facility, in order to allow that to happen. And I guess I think that that's pretty hard. To be clear, Your Honor, I'm not saying the government has to let it go on. I'm saying the government has tools that are better drawn to it than eliminating even the peaceful, consensual conversation. Kennedy. But suppose, and this is still Justice Kagan's question, suppose it were a given, assume that those laws just did not work. Could there then be consideration of a buffer zone? Now, this is a hypothetical that I'm sure that you wouldn't accept in the context of your case, but suppose. Suppose it were a given that there's no way to keep the abortion clinic open. The laws simply do not, of reference to obstruction and blocking entrance, simply do not work. If the laws simply do not work, I think perhaps the government could come in and make a case that it has a compelling interest and that this is the least restrictive means of doing it. Okay. So that now, at this point, that was a better way of getting what I was trying to get at. Just assume that there isn't. Let's look at the narrow part of the case. And let's assume that the Colorado case was right. And this particular restriction is more restrictive than Colorado in two important respects, which you've gone into. Now, the reason that they did that is they had hearings in Massachusetts and they discovered that the Colorado law didn't really work very well. And so what are we supposed to do? Are we supposed to now go look at the — as long as those hearings are legitimate hearings and they have good explanation on something like whether the zone is 8 feet inconsensual or whether it's 35 feet and different amounts of sidewalk, depending on the nearness of the facility, when doesn't it become just up to them? We can't — we're not legislators. We don't know the situation in Massachusetts. We can insist upon a reasonable record, but how can we do more than that? On this detail. So on this detail, what I think the Court should look for is, for example, had they had a case — the State said they did not even convict a single person of one unconsensual approach. But they — you understand that. We all understand that. It's one thing to try to prove an intent on such matters, particularly when people are in good faith. They're trying to explain it. And it's another thing to actually stop the congestion and to protect the interest of the woman who wants to have the abortion, maybe in a fragile state of mind, and this kind of thing could interfere with her health, et cetera. So there are two interests, one on each side. We know 8 feet with the bubble is okay. We're not sure about 35 feet. And they have an evidentiary record. So a few things. One, the reasons this Court gave in Hill for allowing the 8-foot no-approach zone was precisely that it only was about protecting unwilling listeners and it did not stop discussions with willing listeners. There are real people — Scalia. Do you accept that the record here shows that it did not work well in the sense that Justice Breyer — No, not at all. I — — used to use it? As I recall the record, all it says is that the police found it difficult to appoint  They didn't say that they had to fly a bubble, that, you know, they have to measure 8 feet or whatever it is. They didn't say that massive obstruction and protests are occurring, preventing people from — that wasn't the finding, was it? No, I agree. It was not. The claim was — Breyer. That's why I just asked you that question. It just happens that the police testify with some evidence and examples that the 8-foot bubble doesn't work. And it also — they have some evidence and reasons for thinking that if you want to have a conversation, you have to convince the woman to walk 10 feet. I mean, the difference is about half, you know. If you were near me, twice as near, we'd have Colorado. If we're over to where the first row is, we'd have Massachusetts. And they have some evidence that we can't enforce this Colorado thing very well. It doesn't help. Now, go ahead. I want your answer.  I would suggest that you would be more than happy to make my argument from there. I'd hear you. You might hear me, but I would suggest you'd receive it quite differently. If I were sent back there, but the clinic or the State were permitted to stand in front of you like a normal lawyer and make their argument in the normal way, I would suggest that would be a significant difference. And what we have here is— Not denying the difference. Yes. I am asking you — you now have heard different characterizations of the record. I didn't mean to characterize it. I want you to explain what it is in the record, from your point of view or lack thereof, that means that the Constitution intervenes to prevent Massachusetts from doing it. So the constitutional narrow tailoring test under the time, place and manner test requires that the law not restrict substantially more speech than necessary to serve the government's interests. Here— How much is restricted? How long does it take from when you enter the buffer zone until you reach the clinic entrance? If you're walking nonstop, I assume 7 to 10 seconds or something like that. So the conversation can go on before those 7 to 10 seconds. There's not much you're going to be able to do to have a conversation or persuade people in 7 to 10 seconds. I respectfully disagree on that last point, Your Honor. The evidence in this record is that the inability to speak with people close to the clinic has a dramatic effect on the Petitioner's ability to reach their audience. So if someone happens to be walking from the same side of the zone that you're standing on, you may have a shot. Now, the clinic still has the space in front of the clinic to talk to people, which you don't, but you may have a shot if you're on the right spot. And if you know they're going to the clinic. And if you can identify the audience early enough. But, for example, places like Worcester and Springfield, where essentially the only chance to reach the audience is by standing on the public sidewalk and waving a leaflet as they drive through the driveway entrance. If you have to stand 35 feet back and do that, the evidence here shows there's essentially zero chance to reach that audience.  Kagan. Kagan. Kagan. So isn't that more a function, that they just have a private parking lot? So even if this law didn't exist, you actually couldn't reach most of these people because they drive into the private parking lot and you can't talk to them anyway? No, Your Honor. I don't think that's a fair characterization of it. So, yes, there's a private parking lot. But there's a public sidewalk on which, before this law, you had the right to engage in speech. The fact that this law pushes you 35 feet back is what makes it impossible to make the offer. Many people would just drive on by and they don't want the information. And that's fine. That's their right. But many people do want the information and have acted on the information. And this law makes it much harder, almost impossible, in places like Worcester and Springfield. Is there a buffer zone that you would concede is permissible? In other words, if it were 12 feet, would that be all right? So as the size of the zone decreases, I think the imposition on the speech rights is, you know, gets less and less and better and better. And so the adequacy of the alternatives, for example, that may improve as you go. It would still be a problem, I think, to have zones on the sidewalk where even when no one's there, it's a criminal act to have a conversation. Well, but that goes back to Justice Ginsburg's question. I mean, how is a law supposed to deal with that, sort of the fluctuating conditions that may be at a particular clinic site? That's precisely the point. That's why this is not something that should be addressed with a statute like this. This is something that should be addressed with either a statute drawn to something like large crowds or a dispersal statute. The brief, the amicus brief for New York State in support of Massachusetts here talks about how Concord, New Hampshire, and Los Angeles deal with this problem. They give the police the power to disperse crowds when they become obstructive or violent, the same way this Court approved in Boos v. Barry. It is the case, isn't it, that not only abortion counselors are excluded from this area, everybody is, anybody who wants to talk to anybody or who just wants to be there. So can't — I mean, this is a dead speech zone, right? In many respects, it is. In many respects, it is no different than the speech-free zone in the Jews for Jesus case. It's a place where the government claims it can essentially turn off the First Amendment. But the government says it allows you to do that. Kagan. It's more than a speech-free zone. It's also a conduct-free zone, right? You can't sell hats there. You can't, you know, beg there. I mean, you just can't go there. I agree the government has eliminated more than speech on that sidewalk, but they've eliminated speech on that sidewalk as surely as in the Jews for Jesus case. Well, they haven't thoroughly eliminated speech because employees are permitted to speak within the scope of their employment. Isn't that right? Thank you, Justice Alito. Yes. So they haven't eliminated speech for all people. They have presumed to do that. Well, that's a contested point, because the Attorney General reads scope of employment to mean getting to my job and leaving my job and does not include speech activity. So on the face of the statute, I don't think that that interpretation doesn't do very much. The statute has to do with that. The Chief Legal Officer of the State says there's a term that needs to be interpreted. The term is scope of employment. Scope of employment within this statute means getting to work and leaving work, and it doesn't mean political speech. So the Attorney General says it's more than just getting to work and leaving work. He says it's just doing their jobs. First, I don't believe they have the authority to do that. In other words, I don't think they could go arrest somebody who happened to speak about abortion when they work for an abortion clinic. They have an absolute statutory defense. But even if they could limit it to just doing their job, you end up with the problem that the Ninth Circuit saw in the Hoyt case, which is if the clinic is allowed to use that sidewalk, even just to say, good morning, may I help you into the clinic, and the government says that's a valid use of our public sidewalks, but the State says Mrs. McClellan will go to prison if she goes on that sidewalk and says, good morning, may I offer you an alternative, as the Ninth Circuit panel said, that's indubitably content-based. The government doesn't get to decide that the public sidewalk, which it leaves open for people just walking by, right? If I'm going down that sidewalk to get a cup of coffee, it's fine. Kennedy. Kennedy, am I correct that the Attorney General's regulation with respect to employees of the clinic in a way made this even more content-based because there was a prohibition on discussing the abortion procedure? I agree. That's one of the reasons that the interpretation is flagrantly unconstitutional. The government can't simply say to people who work for Planned Parenthood, we won't arrest you when you talk on the sidewalk unless you talk about abortion, right? If you talk about abortion, then we'll arrest you. And that mirrors the State's interpretation of its of the exemption for people walking through the zone, where it says you can walk through, and this is JA 9394, provided that the individual does not do anything else within the buffer zone, such as expressing their views about abortion. So the government is saying you can walk through, but you can't talk about abortion. It's not content, it's not based on speech about abortion. It's that you can't speak about anything. Well, the interpretation as to the employees that the Attorney General has proffered for 6 years is about speech about abortion. So it says it can't talk about abortion. If you're going through the zone just to get somewhere, not to get to the clinic, and you're walking with a companion, can't you speak to your companion as you're walking? It doesn't ban speech by everybody who's walking through. The Attorney General has taken multiple positions on that. In the lower court, their position was you can't talk about abortion or partisan issues. They told the First Circuit that you can't even wear or you could be arrested if you wore a Cleveland Indians shirt while you were just passing through. At this court, they say that people passing through have speech rights. Either one is bad. Either way, the government doesn't have the ability to say who gets to speak and who doesn't get to speak on an open public sidewalk. If I may reserve my time. Roberts. Thank you, counsel. Ms. Miller. Mr. Chief Justice, and may it please the Court. Petitioners can and do protest abortion in Massachusetts, and they can do it in the public spaces right outside abortion facilities. This is not a protest case. These people don't want to protest abortion. They want to talk to the women who are about to get abortions and try to talk them out of it. I think it distorts it to say that what they want to do is protest abortion. If it was a protest, keeping them back 35 feet might not be so bad. They can scream and yell and hold up signs from 35 feet, but what they can't do is try to talk the woman out of the abortion. It's a counseling case, not a protest case. Your Honor, I would say it's a congestion case. Certainly, Ms. McCullen and others can have those conversations right in front of the abortion facility. It's just that those conversations are moved back a few feet. And in point of fact, Ms. McCullen Well, it's more than a few feet. You know, I – 35 feet is a ways. It's from this bench to the end of the court. And if you imagine the Chief Justice as sort of where the door would be, it's most of the width of this courtroom as well. It's pretty much this courtroom, kind of. That's a lot of space. Just as a factual matter, I did want to point out that in Boston, for example, the door is recessed. It's a private entrance with a recessed door, and the 35 feet is measured from the door. So it's actually only about 23 feet. Sotomayor I thought it was two car lengths. McCullen I'm sorry? Sotomayor Two car lengths. McCullen I'm sorry. I didn't hear that. Sotomayor Two car lengths. McCullen Two car lengths. Exactly right, Your Honor. Sotomayor That's, I think, a little less than this courtroom. Breyer I'd just like you to go back to Justice Scalia's question for a second. I didn't hear it, because he was saying that this case is not a protest case. It's simply about calm conversations, and that is what I want to know if the evidence showed that. McCullen Well, certainly there's a picture of a calm conversation. Breyer The evidence upon which Massachusetts based its decision to go to 35 feet instead of 8 feet, there were hearings. Did the evidence show that what was involved was calm conversations between one person trying to counsel another, or did the evidence show something else? McCullen Certainly the evidence showed something else. Experience showed that there had to be a certain amount of space around the facilities. What we had, for example, were pro-choice advocates swearing and screaming at pro-life advocates within the buffer zone. That's at Joint Appendix 26 to 28. You had the Pink Group, which is a pro-choice organization, pushing and shoving and jockeying for position. Scalia Surely you could have a law against screaming and shouting within 35 feet or protesting within 35 feet. Isn't that more narrowly tailored? I mean, what this case involves, what these people want to do is to speak quietly and in a friendly manner, not in a hostile manner, because that would frustrate their purpose with the people going into the clinic. McCullen But, again, experience showed that even individuals who wanted to engage in close, quiet, peaceful conversation were creating congestion around the facility. Breyer But rather, I note, there are some people who are peaceful, in which case I would not accept Justice Scalia's suggestions as a counseling case. But you cited some other evidence that suggests there were other people who were screaming, pushing, and shouting, which sounds like, in his characterization, a protest case. And the reason that Massachusetts found it difficult to write a statute that distinguishes one from the other is why do people write statutes that sometimes do not make these fine distinctions? Why did they in this instance? McCullen They didn't make a fine distinction, Your Honor, because it didn't matter whether people were being peaceful or whether they were protesting. Breyer Could you have written such a statute that would have worked? McCullen It would have been very difficult to write such a statute, Your Honor. Kagan How did you pick 35 feet? Why 35? McCullen Well, again, experience showed that some amount of space around the buffer zones, around the facilities, needed to be open. So then it was simply a question of looking at past experience, at the prior injunctions, for example, Your Honor. For example, in Planned Parenthood v. Bell, which is cited at page 2 of our brief, there was actually a 50-foot buffer zone imposed by a district court judge in Massachusetts. We knew from, of course, Madsen and Schenck that 36-foot buffer zones were acceptable in that when you were being responsive to that kind of problem, and we knew that a 15-foot buffer zone would be acceptable if responding to a similar kind of problem. So at some point or another, the legislature was aware that some amount of space needed to be created, and it chose 35 feet as a reasonable response, a reasonable amount of space around the facility to allow. Breyer Go back for a second. I see that. Is there anything in the record, the obvious reason for a legislator, I think, I did work in the legislature for a while as a staff member, that you don't write these  They have too fine a distinction. The activity is commingled, the activity – all right. Now, I knew you were just going to nod your head as soon as I said that, so I was trying to get you to say it inspontaneously if it's true. Is there anything in this record that suggests that this is one of those cases where it's just too tough to say whether they're counseling somebody or whether they're screaming at somebody, whether they're pushing somebody or whether they're standing near them peacefully? Is there any evidence in the record, I could turn to, that would suggest that? You should say yes. And I will. She can't say yes if it isn't there, because I'm going to ask her where, because I want to read it. I will, of course, Your Honor. The best description of that is, of course, Commissioner Evans's description of the space functioning like a goalie's crease. Well, let me ask this question. Assume it to be true that an elderly lady who was quite successful and had meaningful communication with over a hundred women going into the clinic before this law was unable to talk to even one after this law. Assume that's true. Does that have any bearing on our analysis? And does that have any bearing on Justice Breyer's question about whether or not a law can be written to protect that kind of activity, but still to prevent obstruction and blocking? I think, Your Honor, that no one is guaranteed any specific form of communication. So there is no guarantee, as a doctrinal matter, to close, quiet conversations. The question is, are there adequate alternatives? And in this particular instance, in this record, there are adequate alternatives. Take, for example, the situation in which there is no guarantee of talking quietly. You want me to write an opinion that says there is no free speech right to quietly converse on an issue of public importance? Generally on the public sidewalk. But of course, that right is tempered by the State's interest in making sure that the public sidewalks function as they should and that there is peace and good order. But I would give you an example, Your Honor. I'd point you to it. I still don't know where you're going. This goes to Justice Breyer's question. You cannot write an ordinance that says obstruction, intimidation, blocking is prohibited and still allow the kind of conversation that I described earlier and that I want you to assume to be true for the purposes of this question. Your Honor, we couldn't here, obviously, because that wasn't the problem. The problem with making that kind of a fine distinction is that it doesn't address what the State's interest is. Kennedy, in speech cases, when you address one problem, you have a duty to protect speech that's lawful. You do, as long as your protection is narrowly tailored to your interest. But I think what you have to say to this Court is that it's impossible to write a statute of the kind that we are discussing now. And this is Justice Breyer's question. It would be enormously difficult to write a statute that addressed the problem and the significant interest here where you are making that kind of a fine distinction. May I ask you a question about a distinction that is in this statute? And let me give you this example. A woman is approaching the door of a clinic and she enters the zone. Two other women approach her. One is an employee of the facility, the other is not. The first, who is an employee of the facility, says, good morning, this is a safe facility. The other one, who is not an employee, says, good morning, this is not a safe facility. Now, under this statute, the first one has not committed a crime. The second one has committed a crime. And the only difference between the two is that they have expressed a different viewpoint. One says it's safe, one says it's not safe. Now, how can a statute like that be considered viewpoint neutral? Your Honor, I think what the statute distinguishes is based on what those two different people are doing. The as you say, the employee could say, if she was performing her job, which would be escorting that individual into the facility, and if she wasn't unnecessarily cluttering up the buffer zone, which was the reason that the statute was, was, was enacted in the first place, then that person could say that. You judge it on what she's doing, not what she's saying. Alito, what she's doing is what she's saying. She approaches and she says, this is a safe facility. The other one says, it's not a safe facility. They have a bad safety record. And they're the only people in the zone. If it's as big as this courtroom, they're the only three people in that zone. The difference is a viewpoint difference. What the legislature has done is that it has created a circle around these entrances and has only permitted particular conduct within that buffer zone to allow the traffic to keep moving on the sidewalk and to allow people to get in and out. So unless you have a permissible purpose for your conduct to be in the buffer zone, then you cannot be in the buffer zone, and that is what the statute is addressing. With respect to the statute, the statute is not focused on that buffer zone, and The statute is focused on what they're doing in the buffer zone. Kennedy, what they're doing is speaking. Kennedy, the consequence is just what is described by Justice Scalia. That is the consequence of the statute. Are you saying that the consequences of what you write are irrelevant to this argument? Certainly. I wouldn't say that, Your Honor. However, with respect to viewpoints. It seems to me that you should answer Justice Scalia's question, then. With respect to viewpoint discrimination, Your Honors, the statute has a perfectly legitimate sweep. It allows people to go in and out of the building. It allows pedestrians to go work back and forth across the sidewalk. And it allows for even employees, the snow shovelers mentioned in the Walter Dillon brief. Alito, you could have created a completely silent zone. Now, I don't know whether that would be permissible or not, but it would be a different question. You could have said nobody can speak here. People can shovel snow. They work for the clinic. They can sweep the sidewalk. They can do maintenance. They can go in and out. But they can't utter a word. Well, that would be a different statute. But that's not this statute. This statute says that there is an exemption for employees of the facility if they are operating within the scope of their employment. And surely coming out and saying this is a safe facility is within the scope of their employment. Right. So how do you justify that? Forget about the conduct now. The speech that's allowed. One can speak and say it's safe. The other cannot speak and say it is not safe. What I would argue, Your Honor, is that speech in that particular circumstance of the employee actually doing her job and not unnecessarily cluttering the buffer zone, what then that speech is simply incidental to the permissible conduct. And it doesn't make the statute on its face, it doesn't make it viewpoint discriminatory, because as I said. You think it's incidental? What if there's a real question about whether this is a safe facility? That's incidental speech? It's incidental to her performing her job. And, Your Honor, it's – if there were a circumstance where that kind of speech were habitual or widespread or touched on advocacy in any way, shape or form, then obviously Petitioners would have an opportunity to challenge the statute as applied. But of course, they haven't even begun to make the case that there's viewpoint discrimination actually happening in the buffer zone. Kennedy, it's very hard for me to credit the statement or the implication that for an employee to say, we're glad you're here, you're going to be well taken care of, this is a safe facility, it's important for you to be here, it's very hard for me to credit your statement that that's incidental to their function. It's incidental to the permissible purpose for which they're allowed in the buffer zone. And I should point out, actually, that PPLM, and again, this is in the Walter Dellinger brief at page 2A, they actually train their escorts not to engage in that kind of speech. So that's first of all. And second of all, escorts really only exist and only operate in Boston on Saturday mornings for a couple of hours. They don't work at all in Worcester or Springfield. Kagan. Kagan. But that raises another question, Ms. Miller, because I assume that that's true because the crowds and the obstruction really are, with respect to one facility, at certain periods of time. So Mr. Rienzi says, look, if it's at one facility, not all ten of them or whatever it is, and it's only for certain periods of time, not all day, every day, you know, why not narrow it that way? So why not? Because the experience has shown that you do have problems at Worcester and Springfield, and those problems do center around the driveways. Eighty-five to 90 percent of patients who approach those facilities do so by car. And the only public sidewalk, there's a small slice of public sidewalk between the road and the private driveway, and that's the only opportunity that you'd – that individuals would have in order to protest. And what's happened in the past in Worcester and Springfield is that you would have pacing across these driveways. That's at Joint Appendix 41. You'd have individuals stopping and standing and refusing to move in Worcester. You'd have literature thrown into cars. You'd have hands and heads thrust into open windows. And there was at least one accident in Worcester, and that's at JA-19. So there definitely was conduct that was a problem, and it wasn't even that there are a couple of lone protesters in Worcester or Springfield. There are events in Worcester and Springfield. There are regular protesters there every week, first of all. And second of all, the crowds get much larger at the semiannual. Scalia, I object to you calling these people protestors, which you've been doing during the whole presentation. That is not how they present themselves. They do not say they want to make protests. They say they want to talk quietly to the women who are going into these facilities. How does that make them protestors? Your Honor, they – the problem, of course, that the statute was looking to address was not with protesters per se. It was with people who had a desire to be as close to the facility doors and driveways as possible to communicate their message. But the result of that was congestion around these doors and driveways. So it wasn't a concern about the protest. It was a concern about people actually being able to use it. Kagan. I would think, Ms. Miller, that if you tried to do a statute that distinguished between protesters and counselors, that would be content-based much more than this statute is. I would agree. I mean, but – but, you know, which is not to say that this statute doesn't have its problems, in my view. I mean, so I guess I'm a little bit hung up on why you need so much space. Again, the experience. We've had quite a long experience in Massachusetts, a long history of crowds around these doors, of even violence at the clinics, and we've had law enforcement and others who have viewed that crowd on a regular basis and have described it, the activity around the doors and driveways, as being so frenetic. You have so many people there, the bad actors and the good actors. You have so many people congested in the same space from all points of view that it effectively blocks the door. So – Alito, I'm going to ask you a question that's a little bit more in the video brief. Suppose the State legislature has hearings and they say there's a long history of violence and obstruction at sites where there is a strike and replacement workers have been called in. Could a State pass a statute that says there's a 35-foot zone like this around every location in the State whenever there is a strike and there are replacement workers? Could they do that? Right. Well, of course, labor actions are protected by Federal law. So any State law couldn't directly conflict with Federal law. All right. Could Federal law do that? Well, this Court has repeatedly upheld restrictions on labor activity if given the right record. So there is – so the answer is yes, the First Amendment would permit regulation on the right record. In every case, in every case, there could just be a flat rule. It doesn't matter whether there's any history at that place, any indication there's going to be violence. Maybe there will, maybe there won't, across the board, zone around every place where there's a strike. Right. Well, certainly it would be an easier case to defend if there was a history, as we have here. And you'd have to prove that the solution to this case is that there's a flat rule. You don't think there's a history of violence at places where there are strikes and replacement workers? Well, I don't think there's been the kind of history and sustained violence that we've had on this almost unique record in Massachusetts with respect to facilities. But, Your Honor, I would say that's all I have on understanding labor issues. Sotomayor, is there any abortion clinic that has not had a problem in Massachusetts? In – there was, when the legislature was considering the statute, there was a survey submitted by NARAL that reviewed the experience of the ten facilities that were then in existence in Massachusetts, and six of them said that they had significant problems outside of their facilities. Eight of them said, at the very least, they had regular protesters. There were two who did not report that there was a significant problem. This is testimony by the clinics themselves, right? Correct. Thank you, Your Honors. Thank you, counsel. Mr. Gershengorn. Mr. Chief Justice, and may it please the Court. The Massachusetts statute here is simply a place regulation that does not ban speech, but instead effectively moves it from one part of a public forum to another, in this case, away from the small areas. Which of our precedents do you think governs this case? So, Your Honor, I think that there are a number of precedents that are helpful. Madsen, of course, upheld the 36-foot buffer zone that had a no – a no speech zone very much like this. That was an injunction. It was an injunction, Your Honor, but it was upheld under an even stricter standard that – that applies here. But even aside from that, I think a number of the pillars of Petitioner's argument here are directly contradicted by this Court's precedents. So, for example, the idea that unrestricted – that you have the right to choose the best mechanism of communication is contradicted by Heffron and by Frisbee. In Heffron, there was the Petitioner said, I need to be able to talk quietly to people to ask for money, and that's the only way I can get it. And this Court said, you have ample communication channel, alternative channels over in that booth. In Frisbee, what the protester wanted to do was target a house. And what this Court said in Frisbee was, you have alternative channels of communication. You can go door to door. You can mail things. You can make calls. So I think that that pillar of the – of the argument. Scalia, what's the alternative here? Standing 35 feet away and yelling? No, Your Honor. Is that the alternative? No, Your Honor. To comfort these women? No, Your Honor. The alternative in this case is the entire length of the sidewalk, quiet counseling, leafleting, and conversation is permitted. It is the last 4 to 5 seconds before the petition – before the counselors enter the clinic. Scalia, they don't know who's going into the clinic. Your Honor, the testimony – Until you get to the area close to the clinic, you don't know whether Passersby are going there or not. Your Honor, the testimony is actually to the contrary, that they get – that Ms. McClellan and others get quite good at identifying who is going and is not going into the clinic. And actually, so what we're talking about is a – is the last 4 to 5 seconds before they go in. And Justice Kagan – Is your concern that absent this statute, there will be physical obstruction to the entrance? Is that a major concern? So, Your Honor, let me address that. The answer is – the answer is yes, but that's not all. What the legislature had before it, and Justice Breyer and – Let me – if that's your concern, how many Federal prosecutions were brought in Massachusetts for physical obstruction under the Federal statute? So, Your Honor, I'm not aware of the number. There are 45 FACE prosecutions nationwide, but FACE is a very different statute. The criminal prosecutions in FACE are for murder, arson, and for chaining yourselves to doorway. They are not for the kind of quiet counseling and picketing that's at issue here. But the Federal interest that you're defending is you don't want this physical obstruction statute to be misinterpreted. That's what's wrong with the physical obstructions statute as an answer to many of the problems that Massachusetts is facing. Your Honor, I don't think it's at all an answer to the problems Massachusetts is facing, because as Justice Scalia has repeatedly pointed out, these are not the type of defendants who are at issue in the FACE Act. What the FACE Act is talking about is murder, arson, and chaining to doorways. What this statute is getting at is something quite different. It is congestion in front of doorways. It is people, individuals handing out papers. Kennedy, that's obstruction under the Federal statute. It is not, Your Honor, because those are specific intent crimes in both Massachusetts and in the Federal statute. The, for example, pro-choice protests. Justice Sotomayor said even a dog knows the difference in being stumbled over and being kicked. So, Your Honor, you're saying Federal prosecutions can't tell when people are deliberately obstructing? I'm saying, Your Honor, I'm saying what's at issue here, Your Honor, is not that kind of deliberate obstruction. What the testimony before the legislature was, was that there was a congregation of people and the massing of people. Indeed, there were pro-choice protesters in the zone who certainly are not intending to obstruct. And it was so what they were dealing with was quiet counseling leading to counter counseling leading to congestion in front of the doorways. There also was testimony that there were people handing literature to moving cars, accidents and near accidents, which are not intentional obstruction in the least. The kinds of statutes that this Court, that are at issue in the specific intent crime in Massachusetts in the FACE Act, do not get at the kind of peaceful, quiet, yet congesting and disrupting conduct that is at issue here. And, Justice Breyer, I would urge you to look at the Evans testimony at Joint Appendix 67 to 71, the Heffernan testimony at 79 to 80, the Coakley testimony at JA51 and the Caponi testimony at JA19. There are specific arguments as to why these did not work. The argument Petitioners make here, Your Honors, is very, very broad. The lower courts have upheld buffer zones around political conventions, around circuses, around funerals. The idea that you could defeat those buffer zones by simply saying, I would like to have a quiet conversation with the delegates as they go into the political convention would wipe out a number of court of appeals decisions and the kind of buffer zones that this Court, I submit, and that the lower courts have found, are needed. Alitoso, Justice Breyer, what do you think a State legislature or Congress needs to find in order to establish a zone around some category of facility at which there they have some evidence that there have been some disruptions and some obstruction? Take the example of, I think it's a real ordinance someplace you can't have, there's a buffer zone around fraternal lodges. So, Your Honor, I'm not aware of the history of fraternal lodges. But what's at issue here is really that they have to find, or slaughterhouses, or labor or sites where there are strikes. So I think, I think, for example, in the slaughterhouse or what they found in, around circuses and conventions, is the idea that there is massing of people that prevents the orderly ingress and egress to and from the facilities. What the State was dealing with here was not an isolated incident, but the State had 14, 15 years of history of the massing. They had tried other things. They had tried the statutes that Justice Scalia identified. They had tried a narrower buffer zone. And the testimony was it wasn't working and that the police were coming in and said, we can't enforce it. Why is that? Because they had a hard time measuring consent, evaluating what does a proletariat What kind of a record do they need? Could there be a State law that says no picketing around any, you can never have a picket around any store to try to prevent people, to tell people, don't go, don't patronize this store. Could they do that? Isn't that Thornhill v. Alabama? Right. And what, actually at Thornhill they struck that down, but it was very different from this statute. Thornhill's was a, you can't go anywhere near the facility, and it was only one type of speech. This is content neutral, and it is a narrow buffer zone. Justice Kagan, I really urge you to take measures because Alito I understand. I'll stop. I'll ask this one more time. I think it's, I understand the desire to create a buffer zone around certain sensitive facilities. What I'm asking is what requirements, if any, does Congress or a State legislature have to meet before they can do that? If it is done, do we simply say they have a rational basis for it and that's it, so they can establish basically a buffer zone around any kind of a facility they want? If not, then what needs to be established? So, Your Honor, I think in the evidentiary realm, it's hard to have hard and fast rules. I would say you would need a lengthy history of serious congestion and other problems and a, and a, some sort of showing that the alternatives weren't working. But that's what's here. This problem has been going on in Massachusetts since 1994. This is not something the legislature woke up one day and said, in light of one incident, we're going to deal with this. They tried other things. They, and the evidence therefore supported this. What it would take to support a broader statute, it's hard for me to say, but I think this record shows. Justice Kagan, can I? Alito What about the example of a strike? There certainly is a long history of labor violence at places where there are replacement workers. Could that, could it be done in that situation across the board? So I think that would be a very broad statute and hard, hard to defend. But if there were before the legislature, as there is in this case, the kind of congestion and the solution, I submit, is much narrower than the Petitioners are suggesting. It is to clear out an area around the entrance. Justice Kagan, the testimony is 22 feet from the entrance in Boston, 22 feet from the edge of the doorway to the edge of the, of the buffer zone. It is from me to the marshal. It is not to the back of the courtroom. It is, it's an NBA three-point zone. I don't, it is not. Breyer I understand you're saying the reasonableness of it. But go back to Justice Alito's first question. Maybe we can make some progress here. The regulation of labor is up to the NLRB. All right. Now, the NLRB does regulate picketing. It does say what you can do and can't do. And the courts have reviewed that. And you, what standard do courts use when the NLRB decides in its wisdom and expertise, well, the pickets can go here, but they can't go there. You can do this, but you can't do that, all of which have speech implications. What standard of review do the courts use? So, Your Honor, I'm not aware of the standard they use, but it is a. You are aware of any case, I'm putting it, loading it, because, only because of my ignorance of it, where the standard has differed from the ordinary APA standard. I'm not, Your Honor. I'm not aware of cases one way or the other. And if there, should we create a new standard for reviewing this kind of regulation? I think that's actually a serious question. I don't think so, Your Honor. Thank you. Thank you, counsel. Mr. Rienzi, you have 3 minutes remaining. Thank you, Mr. Chief Justice. Several points. First, it's not impossible to draw a statute to deal with the problems. Forty-nine other States deal with the alleged problems. The next prosecution Massachusetts institutes for blocking a door will be its first in at least two decades. Is that true, Mr. Rienzi? Is Massachusetts's statute the only one of this kind? It is the only State statute of its kind. There are a few municipal statutes that are similar that are, frankly, based on the First Circuit decisions in this case. Secondly, here, the police officers testify that they know all the regular players at the clinics. That's their testimony. They know them all. Well, if you know them all and if they're congregating in the doors and they need to get out of the doors, you should go to court and get an injunction and say, stay out of the doors. Until they do that, the claim that they have to throw their hands up and put people in prison for peaceful speech is not a very persuasive claim. Secondly, all of the evidence that the United States cited, cited you to from the record, all of it, Boston, Saturday mornings, the claim that the legislature can extrapolate from that to ban peaceful speech in Boston at other times when the and at other clinics where the sidewalk is empty and say, well, there's abortion there, and where there's abortion, we expect certain speech problems, therefore we're going to make it illegal to speak there. That's the State's claim here. The evidence is Boston-specific. The First Amendment requires precision. They need to regulate the problem where it happens, and if that means police officers, if that means dispersal laws, if that means actually bringing a face prosecution, which the United States has never done, they ought to do that. But they shouldn't imprison Mrs. McClellan for her speech. Third, the United States mentioned Sotomayor questioning the government's representation. I haven't looked at face protection. I don't believe the government Is it limited to the three situations, to murder, arson, and chaining? Thank you, Your Honor. No, it is not. The statute is not remotely limited to that. I direct the Court to section C. I'm sorry, section – it's the definitions section of the statute. Definition 4, physical obstruction, includes even making entry unreasonably difficult. It is not at all solely for violence. It's for physical obstruction, even making it unreasonably difficult. Counsel said that they've brought 45 cases across the country. That's true. Zero, zero in Massachusetts. They shouldn't be able to restrict the peaceful speech. Lastly, to the extent the Court feels the need to recognize that there are some situations that are so extraordinary that we should put people in prison for peaceful conversations on public streets, that ought to be the exceptional case where the statute passes strict scrutiny and the State actually has tried the solutions that it claims don't work. That is not this case. The government does not claim its restriction could pass strict scrutiny. They didn't say it would be impossible. They said it would be hard. Forty-nine other States do different things. The Federal Government protects peaceful speech in the FACE law. FACE is a great example of something that deliberately gets at the problem, and if somebody's in the doorway and they need to get out of the doorway, the answer is, sir, please get out of the doorway. It is not dragging Mrs. McClellan off the prison because she has a consensual conversation 25 feet away from the doorway. That's an extraordinary power for the government to ask, to selectively control speech among willing participants on public sidewalks. Thank you very much. Thank you, counsel. The case is submitted.